*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0002**

Cole Marie Carlson,
Respondent,

vs.

Cory Ross Holte,
Appellant.

**Filed December 1, 2025
Affirmed
Wheelock, Judge**

Hennepin County District Court
File No. 27-HA-CV-24-990

Cole Marie Carlson, Champlin, Minnesota (pro se respondent)

Cory Ross Holte, St. Paul, Minnesota (pro se appellant)

Considered and decided by Bentley, Presiding Judge; Wheelock, Judge; and Larson, Judge.

**NONPRECEDENTIAL OPINION**

**WHEELOCK**, Judge

Appellant challenges the district court's grant of a former romantic partner's petition for a harassment restraining order (HRO) against him. Because the district court did not clearly err in its findings and did not abuse its discretion in determining that there were reasonable grounds to believe that appellant's behavior constituted harassment, we affirm.

**FACTS**

In September 2024, respondent Cole Marie Carlson petitioned for an HRO against appellant Cory Ross Holte after Holte continued to contact her despite her repeated requests that he stop. After the district court issued an ex parte HRO, Holte filed a motion to dismiss Carlson's petition and requested a hearing. The district court denied the motion to dismiss, and a referee held an evidentiary hearing at which both Holte and Carlson presented evidence.

Carlson testified that she and Holte had been in a romantic relationship for several months beginning around September 2023; however, between January and September 2024, Holte read Carlson's private journal, called her derogatory names, continued to contact her despite her repeated requests for him to stop, and showed up to her house uninvited. In the social-media and text messages Holte sent Carlson, he said she looked like an "absolute skank" and was "the most broken person [he's] ever met," and he repeatedly used foul language and called Carlson names such as "slut" and "blonde . . . bimbo." At the hearing, Carlson presented screenshots of these messages. She testified that Holte's contacts with her via social media and text quickly escalated to occurring every night and became completely inappropriate and emotionally abusive. Holte also read Carlson's private journal, texted her a picture of it, and called her "a liar to [her] core," which she described as "a huge invasion of privacy."

At some point during their relationship, Carlson became pregnant. Carlson testified that Holte's behavior was causing a lot of stress on her pregnancy and that her blood pressure was an issue during the pregnancy. Carlson explained that her health concerns

2

were a reason she told Holte to stop contacting her and blocked Holte's phone number. In May 2024, after Carlson had not communicated with Holte for several months, he showed up at her house uninvited. She testified that this incident was very scary and that the police were called to remove him from the property.

In August, Holte messaged Carlson more than a dozen times with no response from Carlson. Also during the month of August, Carlson notified Holte that their child had been born, after which they became involved in a paternity case and Holte sent dozens more texts. Carlson did not respond to many of the messages, and when she did respond, she consistently directed Holte to communicate with her through the court process in the paternity case. Carlson also explained why she unblocked Holte's phone number on her cell phone, stating that it was because she anticipated needing to have contact with him at some point to discuss their child and she wanted to know if his harassment would stop or if she needed to obtain a restraining order.

Holte testified that he never intended to harass Carlson and argued that, if Carlson did not want to hear from him, she knew how to block him and could have had him blocked at the times he contacted her that she referenced in her petition and testimony. He further testified that, because she had previously threatened to block him, but then contacted him again, he did not view her requests to stop as sincere.

The district court adopted the referee's recommendations in full and issued an HRO based on its determination that Holte engaged in harassment.[1]

Holte appeals.

## DECISION

If a respondent has exercised their right to request a hearing in response to a petitioner's properly served petition for an HRO, a district court may issue an HRO if it finds, after a hearing, that "there are reasonable grounds to believe that the respondent has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b) (2024). In relevant part, the statute defines harassment to include "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another, regardless of the relationship between the actor and the intended target." Minn. Stat. § 609.748, subd. 1(a)(1) (2024). Harassment is conduct that "goes beyond an acceptable expression of outrage and civilized conduct, and instead causes a substantial adverse effect on another's safety, security or privacy." *Kush v. Mathison*, 683 N.W.2d 841, 846 (Minn. App. 2004), *rev. denied* (Minn. Sept. 29, 2004). The HRO statute "requires both objectively unreasonable conduct or intent on the part of the harasser and an objectively reasonable belief on the part of the person subject to harassing conduct." *Dunham v. Roer*, 708 N.W.2d 552, 567 (Minn. App. 2006), *rev. denied* (Minn. Mar. 28, 2006).

---

[1] The district court confirmed the referee's findings and order, at which point they became the findings and order of the district court. *See Griffis v. Luban*, 601 N.W.2d 712, 715 (Minn. App. 1999); *see also* Minn. R. Civ. P. 52.01 ("The findings of a referee, to the extent adopted by the court, shall be considered as the findings of the court.").

We review a district court's grant of an HRO for abuse of discretion. *Kush*, 683 N.W.2d at 843. In doing so, we review the district court's findings of fact for clear error and defer to the district court's credibility determinations. *Id.* at 843-44; *see* Minn. R. Civ. P. 52.01 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). When reviewing factual findings for clear error, appellate courts (1) view the evidence in the light most favorable to the findings, (2) do not find their own facts, (3) do not reweigh the evidence, and (4) do not reconcile conflicting evidence. *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221-22 (Minn. 2021); *see Wilson v. Wilson*, 11 N.W.3d 331, 337 (Minn. App. 2024) (citing *Kenney* in an HRO appeal), *rev. denied* (Minn. Dec. 17, 2024).

Holte argues the district court clearly erred when it found that he engaged in harassment. Specifically, he asserts that the record does not support two findings: (1) that his communication with Carlson was intrusive or unwanted and (2) that his conduct had, or was intended to have, a substantial adverse effect on Carlson's safety, security, or privacy.

## I. The district court did not clearly err by finding that Holte's communication with Carlson was intrusive or unwanted.

Holte first argues that the district court clearly erred when it found that his communications to Carlson were unwanted. The district court found that "adequate notice for noncommunication was requested by [Carlson and] wasn't followed by [Holte]," and

5

it referenced several exhibits that show Holte continued to contact Carlson after she asked him not to.

The record evidence supports that Holte's conduct was intrusive or unwanted. Carlson told Holte to stop sending her harassing text messages and to stop communicating with her. One exhibit shows that Holte texted Carlson five times between 2:00 a.m. and 3:30 a.m., calling her "my nightmare" and a "blonde . . . bimbo" and saying he cannot "f-cking believe" she is the mother of his child. The exhibit also shows Carlson's response that she had to block him but was praying for him. Another exhibit shows that Carlson directed Holte to communicate through the court system and stated that, if Holte were to send more harassing texts, Carlson intended to block him again. Holte's responses include: "I left you a voice[]mail," and "I don't care if you block me." In another text chain, after Carlson told Holte, "I respectfully ask you not to contact me anymore," Holte texted her at least eight more times over the following week.

Holte's argument seems to stem in part from his view that, if the communication was "really unwanted," Carlson could have kept his phone number and accounts blocked. But the fact-finder is in the best position to judge the credibility of the witnesses, and we do not reweigh the evidence. *See Kenney*, 963 N.W.2d at 221-23. Carlson testified that she unblocked Holte at times to see if the harassment would stop, in anticipation of needing to communicate about their child. When it did not stop, she blocked him again. Based on this evidence, we conclude that the district court did not clearly err in determining that Carlson's desire not to receive harassing communications from Holte was genuine.

It is undisputed that, even when Carlson blocked Holte's phone number and accounts and had not communicated with him in months, Holte showed up at her house uninvited. Carlson was afraid, the police were called, and the police told Holte to leave. This occurred after Holte invaded Carlson's privacy by reading her journal, texted her a picture of her journal and accused her of lying to him, and sent her numerous text messages in which he called her derogatory names and used foul language. Carlson repeatedly requested that the communication stop, but Holte ignored her requests. Holte's conduct in continuing to contact Carlson in the manner he did after she was clear in her requests to Holte to stop the harassing communication was objectively unreasonable. *See Dunham*, 708 N.W.2d at 567. Accordingly, the district court did not clearly err when it found that Holte's communication constituted repeated incidents of intrusive and unwanted acts, words, or gestures; indeed, it is strongly supported by the record.[2]

## II. The district court did not clearly err by finding that Holte's communication with Carlson had a substantial adverse effect, or was intended to have a substantial adverse effect, on her safety, security, or privacy.

Holte argues that the district court clearly erred when it found that his conduct had a substantial adverse effect, or was intended to have a substantial adverse effect, on her safety, security, or privacy because he was merely expressing frustration in his communications or trying to speak with Carlson to resolve their conflicts.

---

[2] In his principal brief, Holte asserts that he has evidence not presented to the district court that we should consider. But we may not consider evidence that was not received and considered by the district court. *See* Minn. R. Civ. App. P. 110.01 ("The documents filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases.").

The record provides ample support for the district court's finding. The record includes Carlson's testimony that the impact of Holte's conduct—the significant volume of social-media and text messages containing vulgar language and insults—increased Carlson's blood pressure and caused stress on her and her pregnancy. Although Holte argued to the district court that he was merely expressing his frustration, the district court did not find Holte to be credible. We defer to the district court's credibility determinations and do not reweigh the evidence. *See Kenney*, 963 N.W.2d at 221-23.

Because the record supports the district court's finding that these repeated incidents of intrusive and unwanted acts had a substantial adverse effect on Carlson's safety, security, or privacy, the district court did not clearly err in finding that Holte harassed Carlson.

For the foregoing reasons, we conclude the district court did not abuse its discretion in granting the HRO.

**Affirmed.**